IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

GARDNER DENVER, INC.,
a Delaware corporation,

        Plaintiff,

vs.

ACCURATE AIR ENGINEERING, INC., a
California Corporation, AIR PACIFIC
COMPRESSORS, INC., a California
corporation d/b/a COMPRESSED AIR OF
CALIFORNIA, and JOHN LAGUE, an
individual.

        Defendants.

Civil Action No._____

## COMPLAINT

      Plaintiff, Gardner Denver, Inc. ("Gardner Denver"), complains against

Defendants Accurate Air Engineering, Inc. ("Accurate Air"), Air Pacific Compressors, Inc.,

d/b/a Compressed Air of California ("Compressed Air")[1], and John Lague, an individual,[2] as

follows:

### NATURE OF THE ACTION

      1.     Gardner Denver brings this action to recover lost revenues and profits, transition

costs, damages related to reputational and competitive harm, incidental damages, and other

damages in an amount to be fully proven at trial resulting from breach of contract and breach of

---

[1] This complaint will refer to Defendant Air Pacific Compressors, Inc. by its d/b/a, Compressed Air of California.
All references to Air Pacific Compressors include Compressed Air of California, and all references to Compressed
Air of California include Air Pacific Compressors.

[2] Accurate Air and Compressed Air will be referred to, collectively, as the "Distributor Defendants." Accurate Air,
Compressed Air, and Lague will be referred to, collectively, as the "Defendants."

4841-6334-9179

the implied covenant of good faith as to Defendants Accurate Air and Compressed Air, and fraud as to Defendant John Lague.

2.     Defendants Accurate Air and Compressed Air willfully and materially breached their long-standing contractual agreement with Gardner Denver by failing to provide Gardner Denver with a 90-day written notice prior to termination as expressly required in the operative agreements between the parties.  Instead, Defendant John Lague, President of Accurate Air and Compressed Air, specifically and falsely represented to Gardner Denver that Accurate Air and Compressed Air had ceased all business operations, effective immediately.  Instead of going out of business, however, Accurate Air and Compressed Air had gone into business with one of Gardner Denver's biggest competitors, Atlas Copco, and in the process, delivered Gardner Denver's customers and trade secrets to Atlas Copco, putting the purpose to the lie and the value to the deal.  As a result, Gardner Denver was deprived of the benefit of its bargain with Accurate Air and Compressed Air—90 days to find a new distributor and preserve its customer base and profits—and justifiably relied to its detriment on John Lague's misrepresentations.

## PARTIES

3.     Plaintiff Gardner Denver is and at all times mentioned here a Delaware corporation with its principal place of business located at 222 East Erie Street, Suite 500, Milwaukee, Wisconsin 53202.

4.     Defendant Accurate Air Engineering, Inc. is, upon information and belief, a California corporation with its principal place of business located at 16207 Carmenita Road, Cerritos, California 90703.

4841-6334-9179

5. Defendant Air Pacific Compressors is, upon information and belief, a California corporation, doing business as Compressed Air of California, with its principal place of business located at 12630 Allard Street, Santa Fe Springs, California 90670.

6. Defendant John Lague is, upon information and belief, President of Accurate Air and Compressed Air and an individual residing in the State of California.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because it is an action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. This Court has personal jurisdiction over the Defendants because the forum selection clause in the operative agreements between the parties explicitly states that any legal action arising out of or relating to the agreements must be brought in the courts of the Eastern District of Wisconsin, sitting in Milwaukee, Wisconsin. (Ex. 2, Art. III, § 3.04, "Any legal action or proceeding arising out of or relating to this Agreement must be brought in the courts of the Eastern District of Wisconsin, sitting in Milwaukee, Wisconsin.")

9. Venue is proper in this Court because of the forum selection clause in the operative agreements (*Id.*), and alternatively, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND
### The Gardner Denver – Accurate Air and Gardner Denver – Compressed Air Distribution Relationships

10. Gardner Denver is a leading global manufacturer of industrial air compressors and other flow control technology equipment and related parts, which it sells to customers in the oil and gas, mining and construction, automotive, aerospace, food and beverage, and pharmaceuticals industries, among others. Gardner Denver sells its industry-leading products

3

domestically through an extensive distribution network throughout the United States, including within California.

11.     Accurate Air was a contractually authorized distributor that marketed, sold, and distributed Gardner Denver's industrial air compressors and flow control technology equipment within certain counties in the State of California for more than 30 years.

12.     On information and belief, at all relevant times, Lague served as Accurate Air's President and was heavily involved in the day-to-day operations of Accurate Air's business, including managing its relationships with Gardner Denver and with Gardner Denver's customers and installed base in California.

13.     The operative agreement between Gardener Denver and Accurate Air is the July 1, 1994 U.S. & Canadian Distributor Agreement by and between Gardner Denver Machinery, Inc. and Accurate Air Engineering, Inc. ("AAE Agreement").  A true and correct copy of the AAE Agreement and its various schedules is attached hereto as **Exhibit 1**.  Section I(C) of the AAE Agreement provides that the "effective date of this Agreement is July 1 1994 to June 30 1995" and that the AAE Agreement "shall continue in effect until terminated as provided in Section [V]."  This language creates a valid and renewable one-year term of duration and expressly contemplates successive agreements between the parties in the event none of the certain events itemized in Section V occur.

14.     The certain events itemized in Section V allow for termination of the AAE Agreement for reasons in addition to material default under the contract.  This exclusive list acts to create specific occurrences which further delimit the AAE Agreement's term.

15.     Pursuant to Section V, each party's specific right to terminate without cause is limited by the requirement that the terminating party provide "not less than 90 days' notice in writing to the other party."  (Ex. 1, § V(B)(1)(b).)  In other words, unilateral termination of the AAE Agreement without cause was unequivocally conditioned on the terminating party providing 90 days' written notice.  (*Id*.)  Indeed, by its express terms, the AAE Agreement only could be terminated with less than 90 days' notice upon "mutual written consent of the parties"

4

or upon Gardner Denver's election "on one day's notice" in the event certain specifically delineated events itemized in Section V occurred, including but not limited to performance deficiencies on the part of Accurate Air. (*Id.*, §§ V(B)(1)(a) and (c).)

16.     The AAE Agreement also imposed certain clearly defined obligations upon Accurate Air in exchange for the right to market, sell, and distribute Gardner Denver's products. Specifically, Accurate Air explicitly agreed as follows:

> [Accurate Air] shall not [during the term of the AAE Agreement], directly or indirectly, sell or promote the products (including replacement parts, accessories, filter elements, and lubricants) of a supplier other than [Gardner Denver] if those products compete with products available from [Gardner Denver] under this Agreement.

(*Id.*, § III(A)(2).)

17.     In addition, Accurate Air agreed that, during the term of the AAE Agreement, it would "[u]se its best efforts to sell, advertise, and promote the sale and use of [Gardner Denver's] Products throughout the Area of Primary Responsibility." (*Id.*, § III(A)(1).)

18.     Compressed Air was a contractually authorized distributor that marketed, sold, and distributed Gardner Denver's industrial air compressors and flow control technology equipment.

19.     On information and belief, Compressed Air is a "sister company" of Accurate Air. On information and belief, at all relevant times, Lague served as Compressed Air's President and was heavily involved in the day-to-day operations of Compressed Air's business, including managing its relationships with Gardner Denver and with Gardner Denver's customers and installed base throughout the geographic territory within which Compressed Air sold Gardner Denver's products. This geographic territory included certain counties within the State of California.

20.     The operative agreement between Gardner Denver and Compressed Air is the April 8, 2016 Distributor Agreement by and between Gardner Denver Inc. and Compressed Air of California ("CAC Agreement"). A true and correct copy of the CAC Agreement and its

5

various schedules is attached hereto as **Exhibit 2**.

21.     Section 1.04 of the CAC Agreement provides "this Agreement shall commence on the Effective Date [April 8, 2016] and shall continue in effect until terminated by either party as provided below." (Ex. 2, Art. I, §1.04.)

22.     Pursuant to Section 1.04 of the CAC Agreement, each party's specific right to terminate without cause is limited by the requirement that the terminating party provide "not less than (90) days' notice in writing to the other Party." (Ex. 2, Art. I, §1.04.) In other words, unilateral termination of the CAC Agreement without cause was unequivocally conditioned on the terminating party providing 90 days' written notice. (*Id*.) Indeed, by its express terms, the CAC Agreement only could be terminated with less than 90 days' notice upon "mutual written consent of the parties" or upon Gardner Denver's election "immediately upon written notice" in the event certain specifically delineated events itemized in Section 1.04 occurred, including but not limited to performance deficiencies on the part of Compressed Air. (*Id*.)

23.     For over 25 years, Gardner Denver and the Distributor Defendants conducted business pursuant to the terms of their respective agreements with little issue or disruption. Indeed, in recent years, the Distributor Defendants collectively purchased in excess of $7,000,000 worth of Gardner Denver products annually for resale in California.

24.     To help facilitate the Distributor Defendants' success within California, Gardner Denver often worked hand-in-hand with the Distributor Defendants' management to ensure the Distributor Defendants had access to certain up-to-date sensitive competitive information and marketing collateral intended to enhance their ability to promote and sell Gardner Denver's products against those of competing manufacturers, including Atlas Copco. For example, Gardner Denver shared highly confidential and sensitive competitive information with the Distributor Defendants, including but not limited to current customer and installed base lists, certain proprietary sales strategy documents, documents related to Gardner Denver's internal product positioning and customer relations strategies and requirements, documents related to pricing, customer leads and potential bids, as well as other sensitive information.

6

25.      Given the commercially and competitively sensitive nature of the above-described material and information, Accurate Air expressly agreed that it would "maintain in confidence and safeguard all [of Gardner Denver's] business and technical information which bec[a]me[] available [to Accurate Air] in connection with th[e] Agreement, which information is either of a proprietary nature or is not intended to be disclosed to others." (Ex. 1, § IV(E).)  Accurate Air further agreed to maintain and safeguard the confidentiality of that material "for two (2) years after expiration or termination of th[e] Agreement." (*Id.*)  At all times during the parties' relationship, Gardner Denver expected and enforced compliance with this confidentiality provision.

26.      Compressed Air expressly agreed that it would "hold and maintain in strict confidence all Confidential Information," including but not limited to, "products, product research and product plans, strategies, ideas, concepts, materials, processes, product volumes/amounts, techniques, formulae, and other operational, technical and scientific information, vendor, customer and partner lists, costs and pricing information," for a period of "three (3) years after expiration or termination of [the CAC Agreement]." (Ex. 2, Art. III, § 3.05.)  At all times during the parties' relationship, Gardner Denver expected and enforced compliance with this confidentiality provision.

**Atlas Copco's Acquisition of the Distributor Defendants**

27.      Atlas Copco is a global manufacturer of industrial air compressors and other flow control technology equipment and related parts.  On information and belief, Atlas Copco markets and sells its products to customers in the oil and gas, mining and construction, and automotive industries, among others.  Atlas Copco is one of Gardner Denver's chief competitors in this product market in the United States and abroad.

28.      According to its own press release, on or around October 18, 2019, Atlas Copco "acquired the assets of California based distributors Accurate Air Engineering, and sister company, Compressed Air of California." (*See* https://www.atlascopco.com/en-us/media/local-news-and-corporate-updates/atlas-copco-compressors-acquires-multi-branch-distributor-in-

7

california, *last accessed on* June 6, 2020.)

29.     According to Accurate Air's website, "starting in October 2019, Accurate Air Engineering became a Factory Direct Branch of Atlas Copco Compressors" that has been "serving customers across the region since 1961."  (*See* https://www.accurateair.com/, *last accessed on* June 6, 2019.)  A video celebrating the acquisition was posted to Atlas Copco's Youtube channel on November 13, 2019. (*See* https://www.youtube.com/watch?v=I1wg1TfUoj0, *last accessed on* June 6, 2020.)  The video boasts a high production value, suggesting it took some time to create.  It features specially made graphics, a music bed, pre-recorded interviews, scripted narration, and original footage of Accurate Air personnel handling products emblazoned with the Atlas Copco logo.  Several Accurate Air employees are shown wearing custom-made polo shirts embroidered with the declaration: "AAE – A Factory Direct Branch of Atlas Copco Compressors."  Also in the video, Director of Sales Rick Sawaya affirms Accurate Air's voluntary and deliberate decision to join a competitor, and to take Gardner Denver's customers with it:

> "**Ultimately, <u>we did this</u> for the customers.  We want to be able to provide you with even more innovative solutions. But rest assured, we guarantee the support and uptime of all existing installations**.  It's the same great people you've always worked with.  The difference?  Joining with close to 40-thousand employees makes us stronger, sets us for growth, and creates a winning combination.  <u>**We chose**</u> Atlas Copco because they share the same values as Accurate Air Engineering, and that is putting the customer first.  We look forward to serving you long into the future."

*Id*. (emphasis added.)

30.     On information and belief, the Distributor Defendants now market, sell, and distribute Atlas Copco's industrial air compressors and other flow control technology equipment and related parts throughout the State of California in direct competition with Gardner Denver.

31.     On information and belief, Atlas Copco now directs and controls each Distributor Defendants' business and operations and, thus, Atlas Copco representatives have access to the

8

competitively sensitive and proprietary confidential business information that the Distributor Defendants obtained from Gardner Denver prior to their sale to Atlas Copco.

32.     On information and belief, Atlas Copco and the Distributor Defendants engaged in discussions, negotiations and due diligence concerning their potential acquisition by Atlas Copco for several weeks or months prior to October 17, 2019.

33.     On information and belief, as part of the due diligence process, Atlas Copco gained actual and constructive notice of Gardner Denver's contracts with Accurate Air and Compressed Air, and the contracts' respective mandatory notice provisions.

34.     On information and belief, as part of the due diligence process, Atlas Copco gained access to certain documents, information, and other materials related to the Distributor Defendants' Gardner Denver distributorships, including competitively sensitive business information.

35.     The Distributor Defendants did not, prior to October 17, 2019, advise Gardner Denver of their intended sale to Atlas Copco.

36.     The Distributor Defendants did not provide Gardner Denver with 90 days' written notice of their "without cause" termination of their distributorships, as contractually required. (*See* Ex. 1., at § V(B)(1)(b); *see also* Ex. 3 ("Please be advised that ***effective immediately***, Accurate Air Engineering, Inc., has ceased all business operations and is liquidating its assets.").)

37.     Gardner Denver did not consent in writing, or in any other form or manner, to immediate termination of the Distributor Defendants' distributor agreements.

38.     On information and belief, since October 18, 2019, the Distributor Defendants have marketed, sold, and distributed Atlas Copco's products and parts to Gardner Denver's historical customers and installed base in California.

4841-6334-9179

39.     The Distributor Defendants deprived Gardner Denver of the benefit of the 90-day termination notice period by its immediate termination of the parties' relationship and subsequent sale to Atlas Copco.

40.     Thus, Gardner Denver has suffered reputational and competitive harm, and lost revenues and profits, among other damages, as a result of Distributor Defendants' failure to provide 90 days' written notice of termination and Atlas Copco's acquisition of the two entities.

**The Distributor Defendants' Intentional Misrepresentations Regarding their Operational Status**

41.     Throughout 2018 and 2019, representatives of Gardner Denver engaged in discussions with the Distributor Defendants regarding Gardner Denver's potential acquisition of some or all of both entities' assets. These talks stalled in 2019 as certain issues arose that prevented both parties from moving forward with the transaction. Gardner Denver representatives expected that discussions would resume concerning this transaction once those issues were resolved.

42.     Instead, and without warning, on October 17, 2019, John Lague, the President of the Distributor Defendants, provided Gardner Denver with two identical letters—one on Accurate Air letterhead, the other on Compressed Air letterhead—that Mr. Lague styled "Notice[s] of Cessation of Business/Termination of Distributor Agreement" (the "October 17 Letters"). The October 17 Letters provided, in relevant part, as follows:

> Please be advised that effective immediately, Accurate Air Engineering, Inc. [and Compressed Air], *ha[ve] ceased all business operations and [are] liquidating [their] assets*. We thank you for the many years of being a Gardner Denver distributor, but this action was necessitated due to personal family reasons, including age and health related issues.

True and correct copies of the October 17 Letters are attached hereto as **Exhibits 3 and 4.**

43.     As described below, the Distributor Defendants' representations that they had "ceased all business operations" and were "liquidating" their assets as of October 17, 2019 was

false and an intentional concealment of material facts. In fact, the Distributor Defendants were each on the eve of being acquired by one of Gardner Denver's largest competitors, Atlas Copco, with whom the Distributor Defendants would continue doing business and begin distributing Atlas Copco's products and parts. The Distributor Defendants had knowledge of the representations' falsity, and knowledge of the materiality of their concealment, at the time they sent the October 17 Letters. On information and belief, the Distributor Defendants intended to defraud Gardner Denver and induce its reliance on the false representations and intentional concealment.

44.     In reliance on the Distributor Defendants' representations that they had ceased business operations, Gardner Denver did not immediately pursue its rights and remedies at law and under contract that permitted it to enjoin the Distributor Defendants' improper termination of their agreements to ensure Gardner Denver was afforded the benefit of the 90-day termination notice period to locate a replacement distributor upon termination of the parties' relationships, (see Ex. 1, at § V(B)(1)(b)), to prevent the Distributor Defendants from further violating the agreements' prohibitions on carrying competing equipment lines, (see Ex. 1, at § III(A)(2)), and to prevent the Distributor Defendants from disclosing Gardner Denver's competitively sensitive and proprietary confidential business information, (see id., at § IV(E)). Gardner Denver suffered competitive harm, lost revenues and profits, transition costs, incidental damages, and other damages as a result of this reliance.

45.     On March 23, 2020, in a letter to "Valued Customer[s]" (the "March 23 Letter"), Accurate Air Director of Sales Rick Sawaya ("Sawaya") declares unequivocally that Accurate Air and Compressed Air "are still very much **open for business**." (emphasis in original), directly contradicting the representations made in the October 17 Letters that Accurate Air and

4841-6334-9179

Compressed Air had "ceased all business operations." In the March 23 Letter, Sawaya goes on to assure customers that "[t]hough we are no longer a Gardner Denver distributor, we want to make it clear that *we are still here for you*" (emphasis in original), further establishing that Accurate Air has been telling different stories to different parties—one to Gardner Denver in which it has ceased all business operations and another to its "Valued Customer[s]" in which it has not. A true and correct copy of the March 23 Letter is attached hereto as **Exhibit 5**.

46.     Gardner Denver was lulled into a false sense of security by the Distributor Defendants' misrepresentations of material fact. Instead of being temporarily abandoned by distributors that had permanently ceased operations, as had been represented, Gardner Denver's customers were in the process of being actively delivered to a competitor. Upon information and belief, at the time of their acquisition by Atlas Copco, each of the Distributor Defendants was a going concern. Gardner Denver's justifiable reliance on the Distributor Defendants' misrepresentations induced forbearance of immediate and aggressive action by Gardner Denver to protect its business. That forbearance meant Gardner Denver lost critical time to act to protect and retain its customers and goodwill throughout the State of California. On information and belief, this was the motivation underlying the Distributor Defendants' lies, as well as the value their lies provided to Atlas Copco. As a result of Gardner Denver's justifiable reliance, it suffered competitive harm in the form of lost customers, disclosure of competitively sensitive and proprietary confidential business information, and lost revenues and profits extending well beyond the protections of the bargained-for and contractually mandated 90-day notice period.

47.     The October 17 Letters also provided representations, without substantiation, that the Distributor Defendants had "destroy[ed] all marketing materials and other confidential information" related to Gardner Denver's business. (*See* Ex. 3.) On information and belief,

4841-6334-9179

those representations were false when made, as the Distributor Defendants had operated as

Gardner Denver distributors through and until October 17, 2019 and could not have destroyed all

electronic and hard copies of the competitively sensitive and proprietary confidential business

information Gardner Denver provided to them within one day's time.

48.     On information and belief, the Distributor Defendants still possess, and did not

destroy, some or all of Gardner Denver's competitively sensitive and proprietary confidential

business information.  On information and belief, the Distributor Defendants did not properly

"wall off" or similarly safeguard Gardner Denver's competitively sensitive and proprietary

confidential business information to ensure Atlas Copco representatives were and/or are denied

access to Gardner Denver's competitively sensitive and proprietary confidential business

information.

49.     On information and belief, the Distributor Defendants' representations that they

destroyed Gardner Denver's competitively sensitive and proprietary confidential business

information as of October 17, 2019 were false when made, and the Distributor Defendants had

knowledge of such falsity when they made the representations.  On information and belief, the

Distributor Defendants intended to defraud Gardner Denver and induce its reliance on the false

representations.

50.     In reliance on the Distributor Defendants' representations that they destroyed

Gardner Denver's competitively sensitive and proprietary confidential business information,

Gardner Denver did not pursue its rights and remedies at law and under contract that permitted it

to immediately enjoin the Distributor Defendants from disclosing Gardner Denver's

competitively sensitive and proprietary confidential business information.  (*See* Ex. 1, at §

IV(E)).  Gardner Denver suffered competitive harm and lost revenues and profits, among other

4841-6334-9179

damages, as a result of this reliance.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Uniform Commercial Code)
### (Against Defendant Accurate Air)

51.     Gardner Denver hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

52.     Gardner Denver and Accurate Air entered into a valid and enforceable contract for the purchase of various Gardner Denver products, as memorialized in the July 1, 1994 U.S. & Canadian Distributor Agreement ("AAE Agreement") by and between Gardner Denver Machinery, Inc. and Accurate Air Engineering, Inc.  (*See* Ex. 1.)

53.     The AAE Agreement contains a valid and enforceable choice-of-law provision that selects the law of the State of Illinois.

54.     The AAE Agreement and related sales thereunder are contracts for the sale of goods pursuant to and in accordance with Article 2 of the Uniform Commercial Code, as codified in 810 ILCS 5/Art. 2 et seq.

55.     Gardner Denver performed and satisfied all of its obligations pursuant to its contractual agreement with Accurate Air.  Any and all conditions precedent to performance of Gardner Denver's contractual obligations to Accurate Air have been satisfied or waived.

56.     Accurate Air breached its contractual obligations to Gardner Denver through its failure to provide 90 days' written notice of termination without cause, (*see* Ex. 1, at § V(B)(1)(b)), its sale of Atlas Copco's competing products and parts throughout the Territory (as that term is defined in the AAE Agreement) during the bargained-for 90-day termination notice period, (*see id*., at § III(A)(2)), and its disclosure to Atlas Copco of Gardner Denver's competitively sensitive and proprietary confidential business information. (*See id*., at § IV(E).)

57.     As a result of Accurate Air's breach of contract, Gardner Denver is entitled to all applicable remedies under the AAE Agreement and under Article 2 of the Uniform Commercial Code.

58.     As a direct and proximate result of Accurate Air's breach of contract, Gardner

14

4841-6334-9179

Denver has suffered lost revenues and profits, transition costs, reputational and competitive harm, incidental damages, and other damages in an amount to be fully proven at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract)
### (Against Defendant Compressed Air)

59.    Gardner Denver hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

60.    Gardner Denver and Compressed Air entered into a valid and enforceable contract for the purchase of various Gardner Denver products, as memorialized in the April 8, 2016 Distributor Agreement ("CAC Agreement") by and between Gardner Denver Machinery, Inc. and Compressed Air of California.  (*See* Ex. 2.)

61.    The CAC Agreement contains a valid and enforceable choice-of-law provision that selects the law of the State of Delaware.

62.    The CAC Agreement and related sales thereunder are contracts for the sale of goods pursuant to and in accordance with Article 2 of the Uniform Commercial Code, as codified in 6 Del. C. § 2–101 et seq.

63.    Gardner Denver performed and satisfied all of its obligations pursuant to its contractual agreement with Compressed Air.  Any and all conditions precedent to performance of Gardner Denver's contractual obligations to Compressed Air have been satisfied or waived.

64.    Compressed Air breached its contractual obligations to Gardner Denver through its failure to provide a 90-day written notice of termination without cause, its sale of Atlas Copco's competing products and parts throughout its geographical territory during the bargained-for 90-day termination notice period, and its disclosure to Atlas Copco of Gardner Denver's competitively sensitive and proprietary confidential business information.

65.    As a result of Compressed Air's breach of contract, Gardner Denver is entitled to all applicable remedies under the CAC Agreement.

66.    As a direct and proximate result of Compressed Air's breach of contract, Gardner

15

Denver has suffered lost revenues and profits, transition costs, reputational and competitive harm, incidental damages, and other damages in an amount to be fully proven at trial.

**THIRD CAUSE OF ACTION**
**(Breach of the Covenant of Good Faith & Fair Dealing)**
**(Against Defendants Accurate Air and Compressed Air)**

67.    Gardner Denver hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

68.    Every contract, including the agreements between Gardner Denver and the Distributor Defendants, contains an implied covenant of good faith and fair dealing.

69.    Gardner Denver performed and satisfied all of its obligations pursuant to its contractual agreements with the Distributor Defendants.  Any and all conditions precedent to performance of Gardner Denver's contractual obligations to the Distributor Defendants have been satisfied or waived.

70.    Accurate Air's intentional misrepresentations to Gardner Denver, as well as its related failure to provide 90 days' written notice of termination without cause (*see* Ex. 1, at § V(B)(1)(b)), its ongoing and active sale of Atlas Copco's competing products and parts throughout the Territory (as that term is defined in the AAE Agreement) during the bargained-for 90-day termination notice period, (*see id*., at § III(A)(2)), and its disclosure to Atlas Copco of Gardner Denver's competitively sensitive and proprietary confidential business information, (*see id*., at § IV(E)), were all unreasonable, excessive and conducted in bad faith.  By knowingly and intentionally failing to comply with its obligations under the AAE Agreement, Accurate Air breached its duty of good faith and fair dealing with respect to the Agreements.  Accurate Air's actions were intended to deny Gardner Denver the fundamental benefit of its bargain.

71.    Compressed Air's intentional misrepresentations to Gardner Denver, as well as its related failure to provide 90 days' written notice of termination without cause (*see* Ex. 2, at Art. I, § 1.04), its ongoing and active sale of Atlas Copco's competing products and parts throughout its geographical territory during the bargained-for 90-day termination notice period, and its

16

disclosure to Atlas Copco of Gardner Denver's competitively sensitive and proprietary confidential business information, were all unreasonable, excessive and conducted in bad faith. By knowingly and intentionally failing to comply with its obligations under the CAC Agreement, Compressed Air breached its duty of good faith and fair dealing. Compressed Air's actions were intended to deny Gardner Denver the fundamental benefit of its bargain.

72.    As a direct and proximate result of Distributor Defendants' breaches of the implied covenant of good faith and fair dealing, Gardner Denver has suffered lost revenues and profits, transition costs, reputational and competitive harm, incidental damages, and other damages in an amount to be fully proven at trial.

### FOURTH CAUSE OF ACTION
#### (Fraud – Intentional Misrepresentation)
#### (Against Accurate Air, Compressed Air, and John Lague)

73.    Gardner Denver hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

74.    As set forth in the preceding paragraphs, Gardner Denver and Defendants successfully conducted business pursuant to the terms of their respective agreements with little issue or disruption for over 25 years. Indeed, in recent years, the Distributor Defendants, with Lague serving as President of both entities, collectively purchased in excess of $7,000,000 worth of Gardner Denver products annually for resale in California. As part of those respective agreements, Defendants understood and acknowledged that they would exclusively market, sell, and distribute Gardner Denver's industrial air compressors and flow control technology equipment within specific geographic regions in California, and would protect Gardner Denver's highly competitive and sensitive confidential business and proprietary information.

75.    Via the October 17 Letters, Defendants intentionally made false representations and omissions to Gardner Denver. More specifically, the representations that the Distributor Defendants had "ceased all business operations" and were "liquidating" their assets and had "destroy[ed]" all of Gardner Denver's competitively sensitive and proprietary confidential

business information as of October 17, 2019 were false when made. In fact, the Distributor Defendants – each a going concern – were on the eve of being acquired by one of Gardner Denver's largest competitors, Atlas Copco, with whom the Distributor Defendants would continue doing business and begin distributing Atlas Copco's products and parts. Further, the Distributor Defendants had not destroyed Gardner Denver's competitively sensitive and proprietary confidential business information.

76. The Defendants knew that the representations that the Distributor Defendants had "ceased all business operations" and were "liquidating" their assets were false when made, and Defendants knew or should have known that their omission of the fact that the Distributor Defendants were being sold to Atlas Copco was material to Gardner Denver. Thus, the Defendants' misrepresentations and omissions were made with the intent of defrauding Gardner Denver and inducing Gardner Denver into relying upon them.

77. Gardner Denver justifiably relied on the Defendants' intentional misrepresentations and omissions to its detriment by, among other things, not pursuing its rights and remedies at law to immediately enjoin the improper termination of the Distributor Defendants' agreements to: (a) ensure Gardner Denver could locate a replacement distributor to service the relevant counties in California upon termination of the agreements; (b) prevent the Distributor Defendants from disclosing Gardner Denver's competitively sensitive and proprietary confidential business information; and (c) prevent the Distributor Defendants from unfairly and unlawfully utilizing Gardner Denver's competitively sensitive and proprietary confidential business information to market and sell Atlas Copco's products and parts to Gardner Denver's customers and installed base. At the time, Gardner Denver had no reason to know that the Distributor Defendants were on the eve of being acquired by one of Gardner Denver's largest competitors, Atlas Copco, or that the Distributor Defendants would continue doing business and begin distributing Atlas Copco's products and parts.

78. The Defendants' omissions and intentional misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual

18

promises the Distributor Defendants made to Gardner Denver. The duties violated by the Defendants are in the nature of a tort because the relevant duties (e.g., the duty to not make false acts, omissions, concealments, and misrepresentations, and the duty not to disclose Gardner Denver's trade secrets) arose regardless of any contracts between the Distributor Defendants and Gardner Denver. Accordingly, the duties violated by the Defendants are defined by the social policies embodied in the law of torts and beyond those set forth in the parties' agreements.

79. As a direct and proximate result of Defendants' fraud, Gardner Denver has suffered and will continue to suffer damages and harm. Such damages include, but are not limited to, the reputational and competitive harm, incidental damages, and other damages to Gardner Denver's business suffered as a result of its failure to immediately enjoin improper termination of the Distributor Defendants' agreements to: (a) ensure Gardner Denver could locate a replacement distributor to service the relevant counties in California upon termination of the Agreement; (b) prevent the Distributor Defendants from disclosing Gardner Denver's competitively sensitive and proprietary confidential business information; and (c) prevent the Distributor Defendants from unfairly and unlawfully utilizing Gardner Denver's competitively sensitive and proprietary confidential business information to market and sell Atlas Copco's products and parts to Gardner Denver's customers and installed base. Defendants' intentional misrepresentations and omissions were a substantial factor in Gardner Denver's harm, as Gardner Denver would have otherwise sought to immediately enjoin the Distributor Defendants' improper termination of their respective agreements and from disclosing Gardner Denver's highly competitive and sensitive confidential business and proprietary information.

80. As set forth in detail above, since Defendants acted maliciously, fraudulently, and oppressively. Gardner Denver is therefore entitled to recover punitive damages from Defendants.

4841-6334-9179

## FIFTH CAUSE OF ACTION
### (Fraud – Concealment)
### (Against Accurate Air, Compressed Air, and John Lague)

81.     Gardner Denver hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

82.     As set forth in the preceding paragraphs, Gardner Denver and Defendants successfully conducted business pursuant to the terms of their respective agreements with little issue or disruption for over 25 years.  Indeed, in recent years, the Distributor Defendants, with Lague serving as President of both entities, collectively purchased in excess of $7,000,000 worth of Gardner Denver products annually for resale in California.  As part of those respective agreements, Defendants understood and acknowledged that they would exclusively market, sell, and distribute Gardner Denver's industrial air compressors and flow control technology equipment within specific geographic regions in California, and would protect Gardner Denver's highly competitive and sensitive confidential business and proprietary information.

83.     Via the October 17 Letters, Defendants concealed material information from Gardner Denver.  More specifically, the representations that the Distributor Defendants had "ceased all business operations" and were "liquidating" their assets and had "destroy[ed]" all of Gardner Denver's competitively sensitive and proprietary confidential business information as of October 17, 2019 were false and an intentional concealment of material facts.  In fact, the Distributor Defendants – each a going concern – were on the eve of being acquired by one of Gardner Denver's largest competitors, Atlas Copco, with whom the Distributor Defendants would continue doing business and begin distributing Atlas Copco's products and parts.  Further, the Distributor Defendants had not destroyed Gardner Denver's competitively sensitive and proprietary confidential business information.

84.     The Defendants knew that the representations that the Distributor Defendants had "ceased all business operations" and were "liquidating" their assets were false when they were made, and Defendants knew or should have known that their concealment of the fact that the

4841-6334-9179

Distributor Defendants were being sold to Atlas Copco was material to Gardner Denver. Thus, the Defendants' concealments were carried out with the intent of defrauding Gardner Denver and inducing Gardner Denver into relying upon them.

85. Gardner Denver justifiably relied on the Defendants' misrepresentations, omissions, and concealments to its detriment by, among other things, not pursuing its rights and remedies at law to immediately enjoin the improper termination of the Distributor Defendants' agreements to: (a) ensure Gardner Denver could locate a replacement distributor to service the relevant counties in California upon termination of the agreements; (b) prevent the Distributor Defendants from disclosing Gardner Denver's competitively sensitive and proprietary confidential business information; and (c) prevent the Distributor Defendants from unfairly and unlawfully utilizing Gardner Denver's competitively sensitive and proprietary confidential business information to market and sell Atlas Copco's products and parts to Gardner Denver's customers and installed base. At the time, Gardner Denver had no reason to know that the Distributor Defendants were on the eve of being acquired by one of Gardner Denver's largest competitors, Atlas Copco, or that the Distributor Defendants would continue doing business and begin distributing Atlas Copco's products and parts.

86. The Defendants' omissions, concealments, and misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises the Distributor Defendants made to Gardner Denver. The duties violated by the Defendants are in the nature of a tort because the relevant duties (e.g., the duty to not make false acts, omissions, concealments, and misrepresentations, and the duty not to disclose Gardner Denver's trade secrets) arose regardless of any contracts between the Distributor Defendants and Gardner Denver. Accordingly, the duties violated by the Defendants are defined by the social policies embodied in the law of torts and beyond those set forth in the parties' agreements.

87. As a direct and proximate result of Defendants' fraud, Gardner Denver has suffered and will continue to suffer damages and harm. Such damages include, but are not

4841-6334-9179

limited to, the reputational and competitive harm, incidental damages, and other damages to Gardner Denver's business suffered as a result of its failure to immediately enjoin improper termination of the Distributor Defendants' agreements to: (a) ensure Gardner Denver could locate a replacement distributor to service the relevant counties in California upon termination of the Agreement; (b) prevent the Distributor Defendants from disclosing Gardner Denver's competitively sensitive and proprietary confidential business information; and (c) prevent the Distributor Defendants from unfairly and unlawfully utilizing Gardner Denver's competitively sensitive and proprietary confidential business information to market and sell Atlas Copco's products and parts to Gardner Denver's customers and installed base. Defendants' intentional misrepresentations, omissions, and concealments were a substantial factor in Gardner Denver's harm, as Gardner Denver would have otherwise sought to immediately enjoin the Distributor Defendants' improper termination of their respective agreements and from disclosing Gardner Denver's highly competitive and sensitive confidential business and proprietary information.

88.     As set forth in detail above, since Defendants acted maliciously, fraudulently, and oppressively. Gardner Denver is therefore entitled to recover punitive damages from Defendants.

### SIXTH CAUSE OF ACTION
**(Breach of Contract – Attorneys' Fees)**
**(Against Accurate Air, Compressed Air, and John Lague)**

89.     Gardner Denver hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

90.     Section 3.01 of the CAC Agreement provides that:

Distributor its own behalf and on behalf of its parent companies, affiliates, subsidiaries, divisions and agents, will indemnify, defend and hold Company . . . from and against any loss, claim, damage, expense, liability and cost of any kind (without regard to whether the claim is brought or any loss is incurred by a third party or by Company and including but not limited to reasonable attorneys' fees which shall be deemed to include attorneys' fees incurred in connection with enforcing this provision) ("Damages") caused by, resulting from, or otherwise arising as a result of: (a) any breach of this Agreement by Distributor or any party acting on its behalf; or (b) any act or omission of Distributor or any party acting on

22

its behalf . . ..

91.     Accordingly, Gardner Denver is entitled to an award of its attorneys' fees and
costs expended in connection with this action.

**JURY TRIAL DEMAND**

Gardner Denver requests a trial by jury of all issues so triable.

**DEMAND FOR RELIEF**

**WHEREFORE**, Plaintiff Gardner Denver, Inc. prays for judgment and relief against the
Defendants as follows:

1.     Entry of judgment in Gardner Denver's favor for all damages allowed by law –
including, without limitation, compensatory, consequential, incidental, injunctive, reliance,
restitutionary, statutory, delay, exemplary, and punitive – in amounts to be determined at trial;

2.     Award of Gardner Denver its attorneys' fees, its costs, and the maximum
prejudgment and post-judgment interested allowed by law;

3.     Grant of any further relief that may be necessary to achieve justice or that is
deemed proper and appropriate under the circumstances by this Court.

 *s/ Nathan D. Imfeld*
Nathan D. Imfeld  (WBN 1092932)
Trent M. Johnson  (WBN 1056289)
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin  53202-5306
Telephone: 414- 271-2400
Fax: 414-297-4900
Email: nimfeld@foley.com
Email: tjohson@foley.com

*Attorneys for Plaintiff Gardner Denver, Inc.*

4841-6334-9179